STATE of Minnesota, Respondent,

v.

Lonnie AUSTIN, Appellant.

No. CO–82–21.

Supreme Court of Minnesota.

April 8, 1983.

C. Paul Jones, Public Defender, Minneapolis, Hansen, Dordell, Bradt, Odlaug & Bradt, Wayne P. Dordell, John H. Guthmann, St. Paul, for appellant.

Hubert H. Humphrey III, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Chief, Appellate Section, Rick Osborne, Michael Richardson, Asst. County Attys., and Beverly J. Wolfe, Law Clerk, Minneapolis, for respondent.

PETERSON, Justice.

A district court jury returned a verdict finding defendant Lonnie Austin guilty of murder in the first degree, a violation of Minn.Stat. § 609.185(1) (1982). He was convicted for the shooting death of Kevin Johnson which occurred March 9, 1981. The trial court sentenced defendant to mandatory life imprisonment.

Three issues are raised on appeal: (1) was defendant's use of force justified; (2) was the trial court's jury instruction on the law of retreat correct; and (3) was the evidence insufficient to support a verdict of murder in the first degree and, rather, supportive only of a manslaughter in the first degree conviction.

During the month prior to March 9 there had been a series of violent confrontations involving Johnson and members of defendant's family—William, Bobby, and Kenny Austin. Defendant had knowledge of these confrontations, but was not involved personally in any of them. The first confrontation occurred at the home of William Austin. An altercation arose when a woman complained to William that her necklace was missing. Johnson, thinking that he or two women accompanying him were being accused of stealing the necklace, became angry. The Austin brothers, according to Johnson's women friends, "jumped" Johnson and beat him up. Witnesses for defendant testified that Johnson became involved in a fight only with Kenny and that Johnson left threatening them that "it wasn't over" and that he would kill them.

A second confrontation occurred the next evening at the Johnny Baker Legion Post (legion post) located in Minneapolis. Upon entering the legion post William was accosted by Johnson, Johnson's brother, and two friends. They dragged William outside, and in the course of a fight William suffered a broken jaw.

A third confrontation occurred approximately 1 week before the fatal shooting, at a late-night party at the home of David Royster, the state's principal witness. When Bobby Austin arrived at the party, Johnson approached him and accused him of jumping him at William Austin's party. A friend of Johnson's circled behind Bobby, and Bobby thought he was going to be attacked. From Johnson's unbuttoned coat, Bobby could see a handgun. Royster averted a fight by escorting Bobby out of his home. Later that evening, Royster showed Johnson how to use the .357-caliber magnum revolver that Johnson was carrying. Royster, a weapons specialist in Vietnam, had a basement firing range where they shot approximately 20 to 30 rounds.

A description of the legion post is a necessary orientation to the events of March 9. One enters the legion post through a set of glass doors. One can then either go up or down a short flight of stairs. Going up leads to a dance hall area; going down one enters a corridor about 35 feet long. Walking down the corridor, one sees on the right a table area and small kitchen; on the left, two doors opening to adjacent single toilet restrooms, male and female. The distance from the restrooms to the base of the flight of stairs is approximately 25 feet. At the end of the long hallway is the opening to the downstairs bar. Entering the bar, the following comes within view: to the left (or north of the building) is a jukebox and several tables; straight ahead is an open area with many more tables and chairs; and to the right is a bar, with stools along the bar. There is a door in the rear of the bar area leading to a back exit of the legion post.

On the evening of March 9, defendant entered the bar. He was armed with a .38-caliber, five-shot revolver he had purchased "to protect" himself. He saw David Royster sitting near the jukebox and greeted him. He sat down by the bar with a

friend. Kevin Johnson was already at the bar, standing. Shortly thereafter, Kenny and Bobby Austin entered the bar area, their entrances being only a few seconds apart. Bobby greeted Royster and thanked him for interceding in his earlier confrontation with Johnson.

Bobby then saw Johnson at the bar and approached him. They quickly became involved in an argument, and a fight ensued. Bobby struck Johnson because he thought Johnson was making a move toward his coat. During the fight, defendant grabbed someone he thought was going to help Johnson. Royster testified that defendant drew his handgun and pointed it toward the bar and that at about the same time he heard Kenny cock a handgun.

A gun fell from Johnson's coat. Bobby and another shouted that Johnson had a gun. At this point, gunfire started, although no one could testify as to the origin of the first shot. Royster could not identify the source of the gunshots, although he testified that several shots were fired before Johnson picked up his gun. Regardless, both Johnson and defendant fired their guns in this melee. Defendant shot toward the bar after Bobby crawled out of the line of fire. Meanwhile, Kenny testified, Johnson shot him in the stomach. Kenny and Bobby fled the scene after this exchange, Bobby taking Kenny to the hospital. Johnson fired shots down the hallway after their departure, but no one was struck by these shots.

Royster lost track of defendant after Kenny and Bobby left the scene. Defendant related that he ducked into what he believed to be the men's restroom (spent .38-caliber cartridges were found in the women's restroom). He reloaded his gun, and while reloading, heard a voice outside the restroom telling another to "load your gun." Royster had told Johnson to load his gun while they were still in the bar. Defendant waited in the restroom for a few minutes for them to go out the door.

Being "scared," as he testified, defendant waited no longer in the restroom, and, instead, he ran out into the hallway and down the hallway to the stairs. At the top of the stairs stood Royster and Johnson. Defendant asserted that he was surprised by the presence of Johnson and Royster on the stairs, and that, as he reached the stairs, Johnson brought his gun around. Defendant testified that he grabbed Johnson, spun him around, and then heard a shot. He began pulling the trigger, not realizing where he was shooting Johnson. Royster, whom the jury could credit, testified that Johnson was reloading his gun when defendant came upon him. Royster heard an initial gunshot, and blood spurted on his jacket. Immediately, turning around, Royster saw defendant fire three shots at Johnson. Royster testified that defendant attempted to shoot him, but the gun was then empty. Defendant fled from the scene. Johnson was dead when the police arrived.

A medical examiner testified concerning the bullets shot into Johnson. She found that Johnson received gunshot wounds to his chest, head, and legs. One bullet entered 2 or 3 inches below the right side of the back of his neck, traveled from the back through the lung, and exited just below the right collarbone. Black marks surrounding the wound indicated that it was a contact wound, caused by a shot fired within 6 inches to 1 foot of Johnson. This wound could have been fatal. Another bullet entered on the left side of the head, above the left ear, and traveled through the head. This wound also could have been fatal. Two other bullets caused nonfatal wounds: one going through both legs, and another penetrating slightly into the neck and then exiting.

■ 1. Defendant moved for acquittal both at the close of the state's case and at the end of trial, contending that the killing of Johnson was justified. It is the burden of the state—once the issue of justification is raised—to establish beyond a reasonable doubt that the killing was not justifiable. *State v. Harvey,* 277 N.W.2d 344, 345 (Minn. 1979); *State v. Columbus,* 258 N.W.2d 122 (Minn.1977); *State v. Housley,* 322 N.W.2d 746, 750 (Minn.1982).

Three conditions must concur to excuse or justify the use of deadly force under Minn.Stat. §§ 609.06 and 609.065 (1982):

(1) The killing must have been done in the belief that it was necessary to avert death or grievous bodily harm.

(2) The judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances.

(3) The defendant's election to kill must have been such as a reasonable man would have made in light of the danger to be apprehended.

*State v. Boyce,* 284 Minn. 242, 254, 170 N.W.2d 104, 112 (1969); *State v. Housley,* 322 N.W.2d 746, 750 (Minn.1982).

Notwithstanding defendant's knowledge of prior violent confrontations between members of his family and Johnson and the shooting melee which took place in the bar, we hold that the evidence was fully sufficient to support the jury's finding that—at the particular time and place where the fatal shooting occurred—defendant's killing was not done in the belief that it was necessary to avert his own serious injury, nor was it a reasonable election in light of the danger to be apprehended, defendant being exposed to no grave peril at that place or time. First, the testimony and physical evidence indicates that Johnson's back was toward defendant and that Johnson was in the process of loading his gun. Royster so testified, and .357-caliber magnum cartridges were found scattered under Johnson's body. Second, defendant shot Johnson in the back, at close range (no more than 12 inches). Both of these factors are strongly suggestive that defendant approached Johnson with stealth. Third, defendant, having once shot Johnson in the back, shot him three more times. Finally, defendant attempted to shoot Royster, who was unarmed and standing next to Johnson, strongly corroborating the conclusion that the shooting was not done to avert defendant's own injury.

Whatever danger Johnson's presence at the front door of the building may have been to defendant, he did not avail himself of the opportunity for a safe retreat. It is well settled that there is a duty to retreat and avoid danger if reasonably possible. *State v. Johnson,* 277 Minn. 368, 373, 152 N.W.2d 529, 532 (1967). The duty relates to defendant's election to kill, making a killing unjustified if danger was reasonably avoidable. Several options for escape or avoidance of peril were available to defendant rather than directly confronting Royster and Johnson. Defendant could have remained in the restroom, or gone back to the bar area, or otherwise waited until Royster and Johnson had left. He also could have departed through the back exit. Considering the length of the hallway, from the bar and restroom to the stairwell, the jury could well have believed that these were reasonable options and that defendant made an aggressive choice to confront Johnson at the front entrance. We accordingly hold that the evidence amply supported the jury verdict finding defendant's killing unjustified.

Defendant's reliance upon *State v. Gardner,* 96 Minn. 318, 104 N.W. 971 (1905), is misplaced in this context. That case held (on "facts peculiar to frontier life") that the duty to retreat does not exist when two individuals, armed with guns, confront each other in an open space. The underlying rationale of the case—where two men met in a woods—is that there is no place to run out of firing range. This case is inapplicable when defendant, as in the present case, had reasonable options to avoid danger prior to his confrontation.

2. Defendant's claim of error in the characterization and instructions of the doctrine of retreat are unavailing for four reasons. First, the state did not improperly characterize the law of retreat. The state told the jury, "before you can avail yourself of self-defense, you must retreat and avoid the danger if you can reasonably do so. If you can reasonably avoid it, you must retreat and avoid the danger, rather than charge into the fight and flail away." This is a proper characterization of the law. Second, defense counsel gave his character-

ization in the final argument. Although the state objected, the trial court overruled the objection and informed the state that defense counsel was free to give his own characterization of the law. Third, the court gave an instruction on retreat conforming to the applicable case law, using the jury instruction guide approved by this court. CRIMJIG 7.08 (1982 pocket part at 15); *see also State v. Jones,* 271 N.W.2d 534 (Minn.1978). And finally, defendant failed to object to this instruction, and no request was made for a different instruction.

█ 3. Defendant contends that the evidence supports a conviction of no more than manslaughter in the first degree (heat-of-passion killing). The jury was instructed on murder in the first degree, murder in the second degree, and manslaughter in the first degree.

The evidence does support the premeditation necessary to a first-degree murder conviction. The requisite premeditation could have been formed from the time defendant saw Johnson at the bottom of the stairs to the point where defendant went up the stairs and shot Johnson in the back. *See, State v. Wahlberg,* 296 N.W.2d 408 (Minn. 1980).

█ Further, the evidence does not support a heat-of-passion manslaughter conviction. Defendant points to no act of Johnson—during their meeting near the front entrance of the legion post—which is necessary to a manslaughter conviction under Minn.Stat. § 609.20(1) (1982). The confrontations in the bar had ended, and defendant had a time interval in the restroom which would negate a provocation based on the bar shooting. *See, State v. Lee,* 282 N.W.2d 896 (Minn.1979); *State v. Boyce,* 284 Minn. 242, 170 N.W.2d 104 (1969).

The conviction is affirmed.